# United States Court of Appeals
## For the First Circuit

No. 23-1513

SCOTT D. PITTA,

Plaintiff, Appellant,

v.

DINA MEDEIROS, individually and in her official capacity as
Administrator of Special Education for the Bridgewater Raynham
Regional School District; BRIDGEWATER RAYNHAM REGIONAL SCHOOL
DISTRICT,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor, IV, U.S. District Judge]

Before

Gelpí, Selya, and Lynch,
Circuit Judges.

Scott D. Pitta, pro se, for appellant.
Peter L. Mello, with whom Murphy, Hesse, Toomey & Lehane,
LLP, was on brief, for appellees.

January 4, 2024

**LYNCH**, **Circuit Judge**.    Scott D. Pitta, the attorney father of a public school student, appeals from the decision of the Massachusetts U.S. District Court granting the motion to dismiss his First Amendment claim against Bridgewater-Raynham Regional School District ("the District") and Dina Medeiros, the District's Administrator for Special Education.    Pitta v. Medeiros, No. 22-11641, 2023 WL 3572391 (D. Mass. May 19, 2023).

After the District denied his request to video record a private meeting with school district employees to discuss the Individualized Educational Program ("IEP") of his child, Pitta brought suit under 42 U.S.C. § 1983, alleging that he had a constitutional First Amendment right, which the appellees had denied, to video record what was said by each individual at his child's IEP Meeting.    The district court held that Pitta, on the facts alleged, did not possess such a First Amendment right, id. at *8, and that is the only issue on appeal.    To be clear, Pitta does not allege that he had a right to record an IEP Team Meeting under any federal or state statute or regulation.    We affirm the district court's dismissal of Pitta's First Amendment claim.

**I.**

We first detail the allegations in Pitta's complaint and events in his further filings, on which he relies.    Pitta is a resident of Bridgewater, Massachusetts.    His child attends public school in the District and, at the time of the events pled,

received IEP services.  Appellees are the District, a Massachusetts school district organized under Massachusetts General Laws ch. 71, § 14B, and Medeiros in her official capacity as the District's Administrator of Special Education.  Pitta originally sued Medeiros in her individual capacity as well, but this claim was dropped on appeal.

On February 15, 2022, and March 8, 2022, during the COVID-19 pandemic, Pitta and pertinent District employees engaged in two meetings ("IEP Team Meetings") virtually to "discuss and develop a new IEP for [Pitta's] child."  During these meetings, although the appellees had previously "argu[ed] to remove [Pitta's] child from IEP based special education services," "several school district employees" admitted "that the [District and Medeiros] had no data upon which to base their opinion" that his child should be removed from these services, and "that teachers who performed evaluations on the child that resulted in findings contrary to the [appellees'] position were later asked by the [appellees] to 'double check' their evaluation, but teachers whose evaluation results supported the [appellees'] position were not asked to do the same."  The complaint alleges that "[d]espite lengthy discussions" of these statements, these statements "were not included in the [appellees'] official meeting minutes that were emailed to [him] on March 10[], 2022."  When Pitta alerted appellees to these "omissions and inaccuracies," he "objected to

the [appellees'] minutes as an official record of the meetings and requested that the minutes be amended to include the omitted portions," but appellees "refused to amend the meeting minutes."

Months later, on September 20, 2022, Pitta attended another IEP Team Meeting, conducted virtually through "Google Meet," to discuss his child's IEP. Pitta requested that the appellees video record the meeting using the Google Meet record function.[1] He did so, he alleges, because of appellees' previous "failure to produce accurate minutes of prior meetings and refusal to correct those errors despite obligations to maintain accurate records under 603 CMR 23.03." Appellees refused his request to make such a video recording, stating that such a recording would be "invasive" and was not permitted by District policy. Appellees did offer to audio record the meeting instead. Pitta then told Medeiros, the IEP Team Meeting chair, that since the District's policy prohibited them from video recording the meeting, he would make his own recording. Once the meeting began, the appellees announced that they were audio recording the meeting, and Pitta stated that he was video recording it. At that point, Medeiros stated that if Pitta did not stop his video recording, she would

---

[1] Both Pitta's complaint and the appellees' brief state that Pitta "requested that the Defendants[] video record the meeting using the Google Meet record function." As the district court noted, Pitta did not specify which District employees, other than Medeiros, attended the IEP Team Meeting. Pitta, 2023 WL 3572391, at *7.

end the meeting.  When Pitta refused to stop the video recording, Medeiros terminated this meeting.  Pitta filed this suit on September 28, 2022, within days of the failed meeting, seeking declaratory and injunctive relief.

On October 3, 2022, after Pitta had filed this suit, Medeiros emailed Pitta that the District had "figured out a way to accommodate [his] request to know who is speaking while the meeting is being audio recorded" and was attempting to find a mutually agreeable time "for the educational Team to reconvene from the attempted [IEP] Team [M]eeting scheduled on 9/20/22."[2]  She proposed that "[t]eam members will all be audio recorded and participate with the camera off.  When speaking, their identity box will be indic[a]ted as the person speaking by lighting around/within the box."  She wrote that this would allow Pitta to "be able to tell who is speaking" while "looking at the screen."  Pitta agreed to a virtual IEP Team Meeting under these conditions to take place on October 21, 2022.[3]

---

[2]    On a motion to dismiss, we may consider documents which are of undisputed authenticity, official public records, central to the plaintiff's claim, or sufficiently referred to in the complaint.  Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993). We will consider the e-mails attached to appellees' memorandum to the district court as documents of undisputed authenticity.

[3]    The record does not reflect whether this meeting took place.  At oral argument, Pitta stated that after the district court granted the appellees' motion to dismiss in this case, the District rescinded its offer to allow this kind of recording and

After filing this suit, Pitta sent a public records request on July 10, 2023, seeking from the District "[a]ll special education policies, procedures, etc[.] regarding the IEP process in effect from January 1, 2022[,] to the date of th[at] request"; "[a]ll emails to or from Paul Tsovolos or Dina Medeiros regarding the same information"; and "[a]ll changes or proposed changes to policies, procedures, etc[.] requested."  On July 24, 2023, the District provided Pitta with a copy of the Bridgewater-Raynham Regional School District Special Education Policy and Procedure Manual ("Manual").[4]

The Manual explains in detail the District's requirements and policies regarding IEPs, the composition of IEP Teams, and the conduct of IEP Team Meetings.  It lists the specific individuals who comprise an IEP Team as: "the student's parent(s); at least one regular education teacher familiar with the student; at least one special education teacher familiar with the student; a representative of the district who has the authority to commit

---

has since restricted both audio and video recording of IEP Team Meetings.

[4]    Pitta filed a Supplemental Appendix with his reply brief containing the Manual, as well as a June 4, 2003, letter written by Stephanie S. Lee, then-Director of the Office of Special Education Programs at the Department of Education ("DOE").  We take judicial notice of the official documents contained in the Supplemental Appendix, the appellees not having contested their authenticity.

resources[5]; an individual who can interpret evaluation results; other individual(s) who have knowledge or expertise regarding the student; [and] if appropriate, the child."

The Manual states that "[t]he [IEP] Team is charged with managing three important activities: Eligibility Determination/ Initial and Reevaluation[;] Development of the IEP[; and] Placement Decision." (Emphasis omitted.) "After finding a student eligible for special education services, the Team develops the IEP." "The IEP must be tailored to the individual student['s] needs as determined through the evaluation process." It explains that "[d]uring an IEP Meeting, Team members share information and discuss the needs of the student in order to gain a comprehensive understanding of the student." IEP development is a "student driven, individualized process," and "[a] well-managed Team meeting" solicits and considers highly personalized information about the student for whom the IEP is being developed, including "parent/student input," "the student's future dreams and goals," "how the student's disability affects the student's learning," and "how the student performs today," as well as "the areas that are affected by the disability" and the "supports and services the student needs for success." Team members must also review "the

_____

[5]     The Manual instructs that "[t]he Director of Student Services, Administrator of Special Education, Special Education Coordinator, Principals and Chairpersons/Department Head have the authority to commit District resources."

student's strengths, interests, personal attributes, and personal accomplishments as well as key evaluation results," among other behaviors and personal characteristics of the student.

The Manual states that "[Massachusetts] regulations and [the District] require[] attendance at the Team Meeting of the following staff members: (1) Regular Education Teacher[;] (2) Special Education Teacher[;] (3) A representative of the district who is able to commit the resources of the district[; and] (4) An individual who can interpret the instructional implications of [the] evaluation results, who may be a member described above." In addition, "[t]he Administrator or Coordinator of Special Education is available to attend any meeting where the Team feels it will be discussing resources beyond those which are readily available in their school building." The Manual permits "[a]lternatives to 'physical meetings'" for IEP Team Meetings, "including video conferencing, telephone conferencing, or virtual meetings."

The Manual does not address the topic of video recording these meetings. It does specify, however, how IEP Team Meetings should be documented. The Manual describes the use of an "N1 letter" as "a tool used to formally document the proposed action and justification for that action that a school district will take following a Team meeting." "The N1 letter is the district account and perspective on the proceedings and should outline all perceived

viewpoints and responses resulting from the Team discussion," including "a clear student-centered recommendation that allows for the student to receive a Free and Appropriate Public Education," "documentation of the consideration of any rejected factors by the Team," "all district based information (staff input, observation, evaluation)" and "all information obtained from parents or non-district members of the Team (parent observation, outside evaluations, outside service provider input, discharge summary)." The Manual also requires that the IEP Team Members "[u]se the Team Meeting Notes Form to document pertinent information summarizing the [IEP Team] meeting and action plan."  It states that "[a]ny formal meeting among Team members, including parents, should result in either: a completed IEP or the Team Meeting Notes/Summary form in lieu of the completed IEP (if changes are made to the IEP)."

## II.

On October 20, 2022, Medeiros and the District moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.  After briefing and argument, the district court issued its Memorandum and Order granting the defendants' motion to dismiss on May 19, 2023.  See Pitta, 2023 WL 3572391, at *8.  It held that the complaint failed to state a claim under the First Amendment because First Amendment protections for "filming government

officials engaged in their duties in a public place," as recognized by the First Circuit in Glik v. Cunniffe, 655 F.3d 78 (1st Cir. 2011), did not extend to video recording an IEP Team Meeting. Id. at *6 (quoting Glik, 655 F.3d at 82). It reasoned that the meeting did not occur in a "public space," its attendees were not included under the definition of "public officials" as the term was used in Glik and a related case, Iacobucci v. Boulter, 193 F.3d 14 (1st Cir. 1999), and it was unclear whether a right to record public officials existed without a corresponding intent to disseminate the recording, which it found Pitta did not allege. See Pitta, 2023 WL 3572391, at *7-8.[6]

---

[6]    The district court's other rulings are not at issue in this appeal. In addition to their motion to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6), appellees also moved to dismiss it under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction due to mootness and failure to exhaust administrative remedies under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400-1482. Pitta, 2023 WL 3572391, at *3-6. In addition, Medeiros moved to dismiss the complaint against her in her individual capacity for insufficient service of process under Fed. R. Civ. P. 12(b)(4)(e). Id. at *8.

The district court declined to dismiss the complaint for lack of subject matter jurisdiction under Rule 12(b)(1), holding first that the complaint presented a live case or controversy and second that Pitta's claim was not subject to the exhaustion requirement under the IDEA. Id. at *3-6. The court also dismissed Pitta's Fourteenth Amendment claim for failure to state a claim under Rule 12(b)(6) because the complaint did not provide detail beyond mere allegations that his due process rights had been infringed or that he had been denied equal protection of the laws. Id. at *8. Finally, the court dismissed the individual-capacity claim against Medeiros under Rule 12(b)(4)(e) for failure to effect proper service. Id.

- 10 -

Pitta timely appealed.

### III.

We review de novo a district court's grant of a motion to dismiss for failure to state a claim under Rule 12(b)(6). Lyman v. Baker, 954 F.3d 351, 359 (1st Cir. 2020). "[I]n First Amendment cases, appellate courts have 'an obligation to make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'" Cheng v. Neumann, 51 F.4th 438, 443 (1st Cir. 2022) (quoting Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 499 (1984)).

We accept the complaint's well-pleaded factual allegations as true and draw all reasonable inferences in favor of the non-movant. Id. (citing McKee v. Cosby, 874 F.3d 54, 59 (1st Cir. 2017)). "We do not credit legal labels or conclusory statements, but rather focus on the complaint's non-conclusory, non-speculative factual allegations and ask whether they plausibly narrate a claim for relief." Id.

To survive a motion to dismiss, the complaint must "state a claim to relief that is plausible on its face," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007), that is, its "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)," id. at 555.

While the plausibility standard is not a "'probability requirement,' . . . it does require 'more than a sheer possibility that a defendant has acted unlawfully.'" Air Sunshine, Inc. v. Carl, 663 F.3d 27, 33 (1st Cir. 2011) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "Determining whether a complaint states a plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679. If the complaint fails to include "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory," it should be dismissed. Gagliardi v. Sullivan, 513 F.3d 301, 305 (1st Cir. 2008) (quoting Centro Médico del Turabo, Inc. v. Feliciano de Melecio, 406 F.3d 1, 6 (1st Cir. 2005)).

## IV.

"The First Amendment, which applies to the States through the Fourteenth," Mills v. Alabama, 384 U.S. 214, 218 (1966), provides that "Congress shall make no law . . . abridging the freedom of speech," U.S. Const. amend. I. In order to determine whether Pitta's First Amendment rights were violated, we first address whether video recording one's child's IEP Team Meeting is protected by this amendment. See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 797 (1985); see also

Project Veritas Action Fund v. Rollins, 982 F.3d 813, 830-31 (1st Cir. 2020). We conclude it is not.

In Glik v. Cunniffe, this court held that an onlooker possessed a constitutionally protected right under the First Amendment to video tape police officers as they performed an arrest in the Boston Common. 655 F.3d at 82-84. As the appellant in that case was walking through the Common, he caught sight of three police officers arresting a young man. Id. at 79. "Concerned that the officers were employing excessive force to effect the arrest, Glik stopped roughly ten feet away and began recording video footage of the arrest on his cell phone." Id. at 79-80. This court found that First Amendment protections "encompass[] a range of conduct related to the gathering and dissemination of information," and that "[t]he filming of government officials engaged in their duties in a public place, including police officers performing their responsibilities, fits comfortably within" this range.[7] Id. at 82.

---

[7] In making its determination, the Glik court commented that "we have previously recognized that the videotaping of public officials is an exercise of First Amendment liberties," citing Iacobucci, 193 F.3d. But Iacobucci did not raise a First Amendment claim. Rather, the case involved a 42 U.S.C. § 1983 claim for false arrest brought by a local journalist who was arrested while attempting to film commissioners of the Town of Pembroke's Historic District Commission in the Pembroke Town Hall after a public meeting of the Commission. Iacobucci, 193 F.3d at 17-18. Iacobucci attended the Commission meeting to videotape it for "a weekly news program that he produced and broadcast via a cable television outlet." Id. at 17. He refused to stop recording

This court also recognized on the facts therein a First Amendment right to video and audio record police officers in Gericke v. Begin, 753 F.3d 1 (1st Cir. 2014), and in Project Veritas, 982 F.3d. Gericke held that an individual has a right to record police officers "carrying out their duties in public" while conducting a traffic stop on the side of the road. 753 F.3d at 3-4, 7 (quoting Glik, 655 F.3d at 82). Gericke was driving on the highway in Weare, New Hampshire, at approximately 11:30 pm when a police officer stopped her friend's car, which she had been following. Id. at 3. Gericke pointed a video camera at the police officer and announced that she was going to audio-video record the officer while he interacted with her friend, who had exited his vehicle. Id. When the police officer ordered Gericke to return

---

the meeting despite repeated requests by the commissioners and by police officers eventually called to the scene. Id. at 17-18. After the meeting ended, Iacobucci noticed that the commissioners were speaking with a man in the Town Hall corridor and began filming their conversation "on the assumption that he was witnessing a de facto resumption of the adjourned meeting." Id. at 18. Although the commissioners again asked him to stop filming, Iacobucci persisted. Id. Eventually a police sergeant stepped in front of his camera lens and demanded he cease and desist, but Iacobucci continued video recording, even after he was given the ultimatum of "sit down or be arrested," until the sergeant took his camera and placed him under arrest. Id. The criminal charges were eventually dismissed, but Iacobucci filed a pro se civil action which included the false arrest claim against the sergeant. Id. The opinion stated in dicta that because Iacobucci's "activities were peaceful, not performed in derogation of any law, and done in the exercise of his First Amendment rights, [the defendant police sergeant] lacked the authority to stop them." Id. at 25 (emphasis added).

to her car, she immediately complied, though she continued to point her camera at the officer despite knowing it was not recording.[8] Id. This court held that the "constitutionally protected right to film police . . . discussed in Glik" applied to Gericke's case as well, because "[i]n both instances, the subject of filming is 'police carrying out their duties in public,'" id. at 7 (quoting Glik, 655 F.3d at 82), though the court acknowledged that the circumstances of filming a traffic stop were "substantially different" than filming an arrest in a public park, id. at 5. In doing so, this court emphasized that this holding did not mean "an individual's exercise of the right to film a traffic stop cannot be limited." Id. at 7. "The circumstances of some traffic stops . . . might justify a safety measure -- for example, a command that bystanders disperse -- that would incidentally impact an

---

[8]     Gericke eventually put away the camera in her car's central console on her own accord. Id. When Gericke refused to tell another police officer who had arrived on the scene where she had put the camera and to produce her license and registration upon his request, the officer arrested her for disobeying a police order. Id. at 3-4. The Weare police then filed criminal complaints against Gericke, including unlawful interception of oral communications. See id. at 4; N.H. Rev. Stat. Ann. § 570-A:2. Although town and county prosecutors declined to proceed on the charges against her, Gericke brought an action under 42 U.S.C. § 1983 against the defendant police officers, the Weare Police Department, and the Town of Weare, alleging that "the officers violated her First Amendment rights when they charged her with illegal wiretapping in retaliation for her videotaping of the traffic stop." Gericke, 753 F.3d at 4.

individual's exercise of the First Amendment right to film." Id. at 8.

In Project Veritas, this court held that this First Amendment right to record "police officers discharging their official duties in public space" included the right to make "secret, nonconsensual audio recording[s]." 982 F.3d at 817. Project Veritas involved challenges made by two sets of plaintiffs -- two Boston civil rights activists, K. Eric Martin and René Pérez and a national undercover investigative journalism organization, Project Veritas Action Fund -- to Massachusetts General Laws ch. 272, § 99 ("Section 99"), which criminalized secret audio recordings made without prior permission by the recorded party. Id. Martin and Pérez "allege[d] that Section 99 violate[d] the First Amendment insofar as it criminalizes the secret, nonconsensual audio recording of police officers discharging their official duties in public spaces." Id. Project Veritas, in contrast, challenged Section 99 "insofar as it bans the secret, nonconsensual audio recording of any government official discharging official duties in public spaces, as well as insofar as it bans such recording of any person who does not have a reasonable expectation of privacy in what is recorded." Id. (emphasis added in part). Project Veritas also argued that Section 99 should be "struck down in its entirety" due to overbreadth. Id.

This court upheld judgment for Martin and Pérez, finding that Section 99's prohibition on "secret, nonconsensual audio recording of police officers discharging their official duties in public spaces" violated the First Amendment. Id. More significantly for present purposes, the court vacated on ripeness grounds the district court's grant of summary judgment to Project Veritas's challenge that Section 99 "violate[d] the First Amendment insofar as that statute bars the secret, nonconsensual audio recording of government officials discharging their duties in public." Id. at 817-18. Project Veritas sought to challenge Section 99's prohibition on recording "government officials" in general, which it defined as "officials and civil servants," including persons "employed in a department responsible for conducting the affairs of a national or local government," also known as "public employee[s]." Id. at 843, 843 n.5 (citing Official, Black's Law Dictionary (10th ed. 2014); Civil Servant, Black's Law Dictionary (10th ed. 2014)). But its plans to record government officials and police officers were too "narrow[]" to raise the much broader issue of whether Section 99's prohibition on recording all "government officials discharging their duties in public spaces" violated the First Amendment. Id. at 843. Importantly, this was because "government officials," as defined by Project Veritas, "cover[ed] everyone from an elected official to a public school teacher to a city park maintenance worker."

Id. (emphasis added). This court rejected that definition. Id. Indeed, the court held that the "First Amendment analysis might be appreciably affected by the type of government official who would be recorded;" for example, "a restriction on the recording of a mayor's speech in a public park" would differ from "a restriction on the recording of a grammar school teacher interacting with her students in that same locale." Id. (emphasis added).

Pitta's First Amendment claim rests, as the district court recognized, on a misreading of this Circuit's precedents in Glik, Iacobucci, Gericke, and Project Veritas. These cases do not support his argument that a First Amendment right to record exists whenever "public officials" are operating in "public spaces." Among other things, his argument ignores limitations imposed both explicitly and implicitly by these cases. A student's IEP Team Meeting, whether virtual or in person, is ordinarily not conducted in a "public space." Further, this meeting could not be public because only members of a student's IEP Team may attend an IEP Team Meeting, and because IEP Team Meetings involve the discussion of sensitive information about the student. Nor are school district employees attending these meetings akin to the "public officials" in the cases cited by Pitta. In most of these cases, those "public officials" were law enforcement officers performing their duties in obviously public places. We hold, as did the

district court, that Pitta possesses no First Amendment right to video record IEP Team Meetings and do so for a variety of reasons.

To start, an IEP Team Meeting does not ordinarily occur in a space open to the public. Pitta argues that whether the recording occurred in a public space or non-public space "[i]s [i]rrelevant [f]or [t]he [p]urpose [o]f [a] [m]otion [t]o [d]ismiss" because "[t]he specific forum merely identifies the level of scrutiny applied to the government officials['] restriction of First Amendment activity." He argues from this that "[a] finding that the specific forum is a non-public forum" does not foreclose a finding that he had a First Amendment right to video record.

This Circuit's cases have found a First Amendment right to record government officials performing their duties <u>only</u> when those duties have been performed in public spaces. See <u>Glik</u>, 655 F.3d at 84 (protecting under the First Amendment a recording made "in the Boston Common, the oldest city park in the United States and the apotheosis of a public forum"); <u>Gericke</u>, 753 F.3d at 7; <u>Project Veritas</u>, 982 F.3d. at 844. In <u>Project Veritas</u>, we noted that "[o]ur cases have fleshed out the contours of [the public space] category":

> traditional public fora, such as public parks like the Boston Common (which was the site of the recording in <u>Glik</u>, 655 F.3d at 84); the sites of traffic stops, including those that occur on the sides of roads, <u>see Gericke</u>, 753

> F.3d at 8 . . .; and other "inescapably"
> public spaces, id. at 7, such as the location
> of the recording that occurred in Iacobucci v.
> Boulter, 193 F.3d 14 (1st Cir. 1999), which
> concerned a journalist's arrest for openly
> recording members "of the Pembroke Historic
> District Commission" that were having a
> conversation in "the hallway" of the town hall
> immediately following an open public meeting,
> id. at 17-18.

Id. at 827.  The setting of an IEP Team Meeting could hardly be more different from these public spaces identified in Project Veritas.

The IEP Team Meeting occurred in a password-protected virtual meeting room under the control of a public school official. Even if the IEP Team Meeting were not virtual, but in person, the general public is not free to walk into a school and enter a meeting of educators.  Even parents, apart from the general public, have no constitutional right to attend a meeting to which they were not invited.  See Carey v. Brown, 447 U.S. 455, 470-71 (1980) (finding that the Constitution does not leave state officials "powerless to pass laws to protect the public from . . . conduct that disturbs the tranquility of spots selected by the people . . . [for] buildings that require peace and quiet to carry out their functions, such as . . . schools"); see also Hannemann v. S. Door Cnty. Sch. Dist., 673 F.3d 746, 755 (7th Cir. 2012) (holding "members of the public do not have a constitutional right to access school property"); Lovern v. Edwards, 190 F.3d 648, 655 (4th Cir.

1999) ("School officials have the authority to control students and school personnel on school property, and also have the authority and responsibility for assuring that parents and third parties conduct themselves appropriately while on school property."); Silano v. Sag Harbor Union Free Sch. Dist. Bd. of Educ., 42 F.3d 719, 724 (2d Cir. 1994) (finding appellant, a Board of Education member, "did not have an unrestricted right to enter the school classrooms or hallways during school hours"); Worthley v. Sch. Comm. of Gloucester, No. 22-12060, 2023 WL 2918981, at *5 (D. Mass. Apr. 12, 2023) (holding plaintiff, "as a member of the public, does not have a constitutional interest to access the school during school hours").[9]

---

[9]    We quickly dispatch Pitta's argument that this court should utilize what he calls a "Lawfully Present" standard to define what is a "public space." He argues that if a "member of the public was lawfully present while recording government officials," that space should be deemed public. None of the cases to which Pitta cites support his argument for a "Lawfully Present" standard. There is good reason for this. To give an example, a member of the public called for jury duty, and thus lawfully present in a jury room, does not have a First Amendment right to video record their fellow jurors during deliberations, nor the proceedings of the courtroom from the jury box. See 18 U.S.C. § 1508(a) (banning "record[ing], or attempt[ing] to record, the proceedings of any grand or petit jury in any court of the United States while such jury is deliberating or voting"); Fed. R. Crim. P. 53 ("Except as otherwise provided by a statute or these rules, the court must not permit the taking of photographs in the courtroom during judicial proceedings or the broadcasting of judicial proceedings from the courtroom."); Liviz v. Sup. Ct. of U.S., No. 18-12532, 2018 WL 6592093, at *2 (D. Mass. Dec. 14, 2018), aff'd, No. 18-2252, 2019 WL 2537955 (1st Cir. Mar. 19, 2019) ("To the extent [the plaintiff] contends that there is a First

The public did not, and could not by law or District policy, have access to an IEP Team Meeting. Attendance is limited to members of a student's IEP Team. See 20 U.S.C. §§ 1414(d)(1)(B), 1414(d)(1)(C) (defining the members of the IEP team and policies for IEP Team attendance); 34 C.F.R. 300.321 (outlining policies for IEP Team composition and attendance).

In addition, the IEP Team Meetings not only take place in non-public spaces and are closed to the public, but by their nature involve discussions of personal, highly sensitive information about a student. According to the Manual, these topics include "the student's future dreams and goals," "how the student's disability affects the student's learning," and "how the student performs today," as well as "the areas that are affected by the disability" and the "supports and services the student needs for success," so that all attendees at the meetings can "gain a comprehensive understanding of the student" and discuss or develop an IEP "tailored to the individual student." See also 20 U.S.C. § 1414; 603 C.M.R. 28.05 (outlining the requirements for the IEP development process under Massachusetts law).

Next, unlike the public officials in Glik, Gericke, and Project Veritas, the IEP Team Members were not performing their duties in public, but rather at a virtual meeting with no public

---

Amendment right of camera access to the Supreme Court and other federal courts, such a right has not been recognized.").

access.  The District has effectively argued that video recording
IEP Team Members would hinder their performance of their duties,
as it carries a high risk of suppressing the sensitive,
confidential, and honest conversations necessary when discussing
or developing a child's IEP.  Public school teachers and
administrators carrying out their IEP obligations also do not wield
the same "power of suppression" as police officers, see Glik, 655
F.3d at 82 (quoting First Nat'l Bank of Bos. v. Bellotti, 435 U.S.
765, 777 n.11 (1978)), nor have they been "granted substantial
discretion that may be misused to deprive individuals of their
liberty," as law enforcement officials have, id.  Unlike police
officers, IEP Team Members are not "expected to endure significant
burdens caused by citizens' exercise of their First Amendment
rights." Id. at 84.

We thus also reject Pitta's overbroad argument that the
references to "public officials" or "government officials" in
Glik, Project Veritas, and Gericke, where these terms were used to
refer to police officers, extends to anyone employed by a
government.  This court has never held that the test is whether an
individual sought to be video recorded in the course of his or her
job is a government official.  Pitta's argument ignores established
limitations in First Circuit law, which permit recording of
government officials performing their duties only in indisputably
public places in full view of the public, and even then, only when

- 23 -

the act of filming would not hinder officials in the performance of their public duties and would serve public interests.

For example, in Glik, the court considered what it called the "fairly narrow" First Amendment issue of whether "there [is] a constitutionally protected right to videotape police carrying out their duties in public." Id. at 82 (emphasis added). "The same restraint demanded of law enforcement officers in the face of 'provocative and challenging' speech must be expected when they are merely the subject of videotaping that memorializes, without impairing, their work in public spaces." Id. (emphasis added) (quoting City of Houston v. Hill, 482 U.S. 451, 461 (1987)).

In Gericke, the "government officials" at issue were also police officers "carrying out their duties in public" while conducting a traffic stop on the side of the road. 753 F.3d at 3-4, 7 (quoting Glik, 655 F.3d at 82). This court held that the officer, however, could prevent the recording if he "c[ould] reasonably conclude that the filming itself is interfering, or is about to interfere, with his duties." Id. at 8.

Project Veritas also does not support Pitta's argument. This court held that individuals have a First Amendment right to make "secret, nonconsensual audio recording[s]" only of "police officers discharging their official duties in public spaces." See 982 F.3d at 817. It also reaffirmed that "[t]he government is under no obligation to permit a type of newsgathering that would

- 24 -

interfere with police officers' ability to do their jobs." Id. at 836. There, the record showed no evidence that secretly recording police "would appreciably alter their ability to protect the public either in gross or at the retail level of more individualized interactions." Id.

There is yet another reason Pitta's claim fails. Our cases have repeatedly framed the right to record public information as linked to the right of the public to receive this information. Glik held that recording government officials in public spaces was a protected First Amendment right because "[g]athering information about government officials in a form that can readily be disseminated to others serves a cardinal First Amendment interest in protecting and promoting 'the free discussion of governmental affairs.'" 655 F.3d at 82 (quoting Mills, 384 U.S. at 218). Because "'the First Amendment . . . prohibit[s] government from limiting the stock of information from which members of the public may draw,' . . . [a]n important corollary to this interest in protecting the stock of public information is . . . [the] 'right to gather news from any source by means within the law.'" Id. (emphasis added) (first quoting First Nat'l Bank, 435 U.S. at 783, then quoting Houchins v. KQED, Inc., 438 U.S. 1, 11 (1978) (internal citations omitted)). Similarly, Project Veritas recognized First Amendment protection for secretly recording police officers (extending from prior precedent that protected the

open recording of police, see Glik, 655 F.3d at 84; Gericke, 753 F.3d at 7), because these recordings promote the "cardinal First Amendment interest in protecting and promoting the free discussion of governmental affairs," among other grounds, 982 F.3d at 832 (emphasis added) (internal citations omitted). No such interest is served by video recording an IEP Team Meeting because such a recording is not intended to be disseminated to the public.

Finally, we add that even if Pitta had a First Amendment right to video record his child's IEP Team Meeting, which he does not, his claim would fail. "Even protected speech is not equally permissible in all places and at all times." Cornelius, 473 U.S. at 799; accord Glik, 655 F.3d. at 84 (holding a First Amendment right to video record "may be subject to reasonable time, place, and manner restrictions"); Gericke, 753 F.3d at 7 (holding "[r]easonable restrictions on the exercise of the right to film may be imposed when the circumstances justify them"). Here, the District's prohibition on video recording these meetings is content neutral and narrowly tailored to its significant governmental interest in promoting candid conversations in the discussion or development of IEPs in order to provide students with a "free appropriate public education" ("FAPE") under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400-1482. The policy also leaves open several alternative

channels for collecting and recording information from IEP Team Meetings.

On the record before us, the District's policy is content neutral.[10]  The policy does not "'draw[] distinctions based on the message a speaker conveys.'"  <u>Rideout</u> v. <u>Gardner</u>, 838 F.3d 65, 71 (1st Cir. 2016) (quoting <u>Reed</u> v. <u>Town of Gilbert, Ariz.</u>, 576 U.S. 155, 163 (2015)).  The policy also does not "discriminat[e] among viewpoints" or "regulat[e] speech based on 'the specific motivating ideology or the opinion or perspective of the speaker.'" <u>Reed</u>, 576 U.S. at 168 (quoting <u>Rosenberger</u> v. <u>Rector and Visitors of Univ. of Va.</u>, 515 U.S. 819, 829 (1995)).  "The government's purpose is the controlling consideration" for whether a restriction is content neutral, and here, the policy "serves purposes unrelated to the content of expression."  <u>Ward</u> v. <u>Rock Against Racism</u>, 491 U.S. 781, 791 (1989).  It thus "require[s] a

---

[10]    Pitta argues to us that the District's prohibition on video recording was a viewpoint-based restriction because in his view it was "in direct response to [his] revealing the highly unethical and potentially unlawful actions of the school district['s] administrator" and because there was no written policy on video recording at the time.  Policies need not be written and Pitta has not argued that other parents were not subjected to the same policy.  Further, as <u>Gericke</u> held, a "[r]easonable restriction[] on the exercise of the right to" record may take a variety of forms, including not only a "preexisting statute, ordinance, regulation, or other published restriction with a legitimate public purpose," but also "a reasonable, contemporaneous order[.]"  753 F.3d at 7-8.

lesser level of justification" than a content-based restriction. Rideout, 838 F.3d at 71.

Content-neutral regulations "are subject to intermediate scrutiny, which demands that the law be 'narrowly tailored to serve a significant governmental interest.'" Id. at 71-72 (quoting Ward, 491 U.S. at 791). "A speech restriction is sufficiently narrowly tailored so long as the 'regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" Signs for Jesus v. Town of Pembroke, 977 F.3d 93, 106 (1st Cir. 2020) (quoting Ward, 491 U.S. at 799). "The application of intermediate scrutiny also accords with the approach that we took in Glik and Gericke, even though neither case explicitly named the level of scrutiny deployed." Project Veritas, 982 F.3d at 835.

The purpose of the District's video recording prohibition is to serve its "significant governmental interest," see Rideout, 838 F.3d at 72, in meeting its responsibilities under the IDEA. The IDEA provides federal funding to states to assist them with educating children with disabilities and imposes requirements, including that schools must provide all children with disabilities with a FAPE "'in conformity with the [child's] individualized education program,' or IEP." Parent/Pro. Advoc. League v. City of Springfield, 934 F.3d 13, 19 (1st Cir. 2019) (alteration in original) (quoting 20 U.S.C. § 1401(9)(D)).

The IDEA requires that IEP Team Members create a written IEP tailored to the "unique needs" of the student that expressly addresses a number of sensitive and personal issues and questions. 20 U.S.C. §§ 1400, 1414. These include "a statement" regarding "how the child's disability affects the child's involvement and progress in the general education curriculum," "a statement of measurable annual goals, including academic and functional goals," "a description of how the child's progress toward meeting the annual goals . . . will be measured," and "a statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child, or on behalf of the child, and a statement of the program modifications or supports for school personnel that will be provided to enable the child . . . to advance appropriately toward attaining the annual goals." 20 U.S.C. § 1414. As the appellees argue, "as an integral component to their ability to facilitate the sort of earnest discussion necessary to yield an appropriate IEP, IEP meeting participants must enjoy wide latitude to engage as comfortably as possible in a candid exchange of observations and ideas."

Promoting candor and protecting sensitive conversations in IEP Team Meetings are "purposes unrelated to the content of

expression." <u>Ward</u>, 491 U.S. at 791.[11]  The District's policy prohibiting video recording of these meetings, which could stifle these discussions, also "promotes a substantial government interest that would be achieved less effectively absent the regulation." <u>Id.</u> at 799.

**V.**

For these reasons, we **affirm** the judgment of the district court.

---

[11]  Pitta, allegedly relying on a DOE guidance document, argues for the first time in his reply brief that he needs to video record his child's IEP Team Meeting to meaningfully assert his parental rights protected by the IDEA.  In any event, this is not a First Amendment claim and is waived.  His belated claim is an administrative claim subject under the IDEA to exhaustion before it may be brought as a civil action in federal court.  <u>See</u> 20 U.S.C. § 1415(l) (holding that "before the filing of a civil action . . . seeking relief that is also available under [the IDEA], the [IDEA's administrative] procedures . . . shall be exhausted"); <u>see also</u> <u>Parent/Pro. Advoc. League</u>, 934 F.3d at 20-21.